# In the United States Court of Federal Claims

No. 12-718T
(Filed:  July 23, 2015)

| | |
|---|---|
| ) | |
| DOUGLAS WATERHOUSE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 26 U.S.C. § 6672; Failure to Pay Tax; |
| v. ) | Responsible Person; Willful Conduct; |
| ) | Liability for Penalty |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

*Anthony V. Diosdi*, San Francisco, CA, for plaintiff.

*S. Starling Marshall*, Tax Division, U.S. Department of Justice, Washington, DC, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, and *Matthew D. Lucey*, Trial Attorney, for defendant.  *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, of counsel.

## TRIAL OPINION

**FIRESTONE**, *Judge*

In this case, plaintiff Douglas Waterhouse ("Mr. Waterhouse") seeks a refund of trust fund recovery penalties assessed and partially paid for employment taxes owed to the United States ("the government") by Skyline Contract Glass, Inc. ("Skyline").  The issue in this case is whether it was proper for the Internal Revenue Service ("IRS") to assess Mr. Waterhouse with tax penalties for his role in Skyline's failure to pay over to the government the taxes it had withheld from its employees' paychecks.  Mr. Waterhouse alleges he is entitled to a refund on the grounds that he was not a

"responsible person" within the meaning of § 6672 of the Internal Revenue Code and therefore is not liable for any penalty.  He also argues that even if he was a "responsible person" under § 6672, that he did not act willfully and thus cannot be charged with a penalty.  The government has counterclaimed for the amounts that it alleges that Mr. Waterhouse still owes for the tax periods at issue.  This decision follows a trial on the issue of whether plaintiff was a responsible person and thus required to collect, truthfully account for, and pay over the employment tax obligations of Skyline for the taxable periods ending September 30, 2003, December 31, 2003, and March 31, 2004, and, if so, whether plaintiff willfully failed to collect such tax, or truthfully account for and pay over such tax, or willfully attempted to evade or defeat such tax or the payment thereof.[1]

Under 26 U.S.C. § 6672,

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

---

[1] The parties agree that, under 26 U.S.C. § 6511(b), plaintiff's potential recovery in this case is limited to those amounts he paid to the IRS in the two years prior to filing his claim for a refund. Plaintiff filed his claim on February 16, 2012, and is therefore only entitled to recover amounts he paid to the IRS for these liabilities on or after February 16, 2010.  In addition, the parties agree that plaintiff's complaint erroneously included $21,727.32 that was paid by Mr. Waterhouse's business partner, Roy Statham, and abated from plaintiff's penalty liability. Plaintiff is not entitled to recover amounts paid by other individuals.

26 U.S.C. § 6672(a). The § 6672 assessments are $72,765.68 for the period ending September 30, 2003, $76,562.51 for the period ending December 31, 2003, and $47,906.27 for the period ending March 31, 2004.

The court held a trial on May 16, 2015, with closing arguments on July 7, 2015. After careful consideration, the court finds that Mr. Waterhouse was a responsible person within the meaning of § 6672, and further that he willfully failed to collect the tax owed by Skyline to the United States. Therefore, Mr. Waterhouse is liable for the tax penalties assessed by the IRS for all periods at issue.

## I.   BACKGROUND[2]

### A.   The History of Skyline

Mr. Waterhouse started Skyline with Roy E. Statham, Jr. ("Mr. Statham"). Jt. Stip. ¶ 3. Skyline was incorporated in the State of California on February 10, 1988, and was engaged in the fabrication, design, and installation of glass in both interior and exterior applications. Id. at ¶¶ 1-2. Mr. Statham was President of Skyline, while Mr. Waterhouse was Vice President of Skyline. Id. at ¶¶ 4-5. Prior to 1994, Mr. Statham and Mr. Waterhouse each owned a 50% interest in Skyline. Id. at ¶ 11. Around 1994, Randy Lee ("Mr. Lee"), who was brought into the business to increase sales, was named as a Vice President and given a 10% share of Skyline. Id. Around 1995, Mr. Lee purchased

---

[2] The facts are taken from the parties' pre-trial joint stipulation of facts and conclusions of law, ECF No. 27.

another 10% of Skyline.  Id.  Accordingly, after 1995, Mr. Statham and Mr. Waterhouse each owned a 40% interest in Skyline, and Mr. Lee owned a 20% interest in Skyline.  Id.

When Skyline was started, Mr. Waterhouse and Mr. Statham were the only two individuals involved in the business.  Id. at ¶ 9.  A draftsman and receptionist were hired immediately after Skyline started business, and a bookkeeper was hired shortly thereafter.[3]  Id.  Within 2-3 months, Skyline started to hire shop and field employees as its business activity increased.  Id.  At the peak of its business operations, Skyline employed approximately 50 individuals.  Id. at ¶ 14.

Skyline was profitable for the most part, but had several bad years in approximately 2002-2003 that ultimately led to its demise and bankruptcy of the entity in 2005.  Id. at ¶ 18.  Much of Skyline's work was performed as a subcontractor for a general contractor.  Id. at ¶ 22.  Sometime in approximately 2002 or 2003, Skyline contracted for a large job with a general contractor in San Francisco and spent money in reliance on the income that would be produced upon completion of the job.  Id.  Before the work was complete, a bank foreclosed on the building that was the subject of the work, and Skyline did not receive income as a result of the contract.  Id.

Skyline's objective was to keep "material flow" to its jobs so that the jobs could be completed and creditors could be paid.  Id. at ¶ 19.  However, at times during 2002-

---

[3] Skyline employed several bookkeepers over the years, and both Mr. Waterhouse and Mr. Statham had some familiarity with keeping the books and records of the business.  Jt. Stip. ¶ 12. Additionally, Skyline contracted with an accountant, who prepared its tax returns—as well as Mr. Waterhouse's—and from time to time met with Mr. Waterhouse and Mr. Statham to discuss the business.  Id. at ¶ 13.

2005, Skyline at times failed to pay its vendors, employees, and landlord in a timely

manner.  Id. at ¶ 20.  Mr. Waterhouse was aware that Skyline was having occasional

trouble meeting its financial obligations at this time.  Id. at ¶ 20.  Employees told Mr.

Waterhouse that their checks occasionally bounced, and from time to time Mr.

Waterhouse himself did not take a paycheck.  Id. at ¶¶ 20-21.

Mr. Waterhouse and Mr. Statham made a personal guarantee on a Wells Fargo

loan to fund operations of Skyline.  Id. at ¶ 23.  The loan document was signed by both

Mr. Waterhouse and Mr. Statham, and was necessary to keep the business open and pay

employees.  Id.  Mr. Waterhouse also made a loan to Skyline in an amount of $30,000 to

$40,000 in the form of deferred compensation over the last ten years of Skyline's

business.  Id. at ¶ 24.  Nevertheless, Skyline ceased business operations in approximately

2005 and filed a bankruptcy proceeding.  Id. at ¶ 25.  Prior to filing for bankruptcy, Mr.

Waterhouse and Mr. Statham met with a bankruptcy attorney and discussed Skyline's

debtors and creditors.  Id. at ¶ 26.

### B.    Mr. Waterhouse's Responsibility and Authority

Responsibilities were informally divided between Mr. Waterhouse and Mr.

Statham.  From the inception of the business, Mr. Waterhouse was responsible for

running the shop (glass production center) and field operations (installation of glass) for

Skyline.  Id. at ¶ 10.  This included management of any shop workers and field workers

of Skyline, but did not include management of Skyline's bookkeeper and receptionist.  Id.

Mr. Waterhouse ordered materials and dealt with the customers of Skyline on a project-

by-project basis.  Id.  During the last couple years of Skyline's business activity, Mr.

Waterhouse also hired some project managers to handle the bulk of the project management.  Id.  Mr. Waterhouse would check in the office on a daily basis and spent most of the working day in the field.  Id. at ¶ 15.  Mr. Waterhouse and Mr. Statham would have lunch once or twice a week, just to touch base.  Id. at ¶ 16.

Mr. Waterhouse had the authority to sign checks on behalf of Skyline but would do so only if Mr. Statham was out of the office or unavailable; he did not have a signature stamp and would sign the checks by hand.  Id. at ¶¶ 34-35.  They were the two people authorized to sign checks on Skyline's bank accounts.  Id. at ¶ 36.  Mr. Waterhouse signed at least 37 checks on behalf of Skyline, including checks for the payment of Skyline's federal tax obligations, checks to vendors, and checks to subcontractors.  Id. at ¶¶ 37-74.  Mr. Waterhouse had the authority to authorize payroll checks for Skyline, and typically signed the field workers' payroll checks.  Id. at ¶¶ 76-77.  Additionally, Mr. Waterhouse had the authority to open and close Skyline's bank accounts, guaranteed and co-signed Skyline's corporate bank loans, had the authority to make and authorize Skyline's bank deposits, and signed Skyline's first quarter 2001 Form 941, Employer Quarterly Federal Tax Return, which showed a balance due of $106,746.75.  Id. at ¶¶ 80-83.

Mr. Waterhouse only managed field and shop employees at Skyline, and was authorized to hire and fire employees who worked in the field or shop at Skyline.  Id. at ¶¶ 75, 78.  He also purchased materials for projects as part of his project management responsibilities.  Id. at ¶ 79.

### C.    Employment Tax Liabilities

Before starting Skyline, Mr. Waterhouse knew that employers made payments to the United States for employment taxes withheld from their employees' paychecks.  Id. at ¶ 28.  Before Skyline ceased operations, Mr. Statham informed Mr. Waterhouse that Skyline was delinquent on paying employment taxes withheld over to the United States and that he was working on getting them paid.  Id. at ¶ 29.  At a February 2004 meeting with the IRS, the revenue agent conducted an interview of Mr. Waterhouse, and recorded the results of that interview on a Form 4180.  Id. at ¶ 30.  At the conclusion of the interview, Mr. Waterhouse was given the opportunity to look over the form and confirm or correct what the agent wrote.  Id.  Mr. Waterhouse signed the Form 4180, and declared that the information on the form was correct and complete, to the best of his knowledge or belief.  Id.  The document notes that Mr. Waterhouse was told of Skyline's tax liabilities.  Def.'s Tr. Ex. 5 at 006.  After the IRS's 2004 visit, Skyline was able to stay in business for another year.  Jt. Stip. ¶ 32.  During that time, vendors were paid after Mr. Waterhouse learned about Skyline's unpaid tax liabilities.  Id. at ¶ 31.  The IRS began collecting on Mr. Waterhouse's § 6672 assessment in 2007.  Id. at ¶ 33.

### D.     Trial Testimony

At trial, the court heard testimony from Mr. Statham and Mr. Waterhouse.

### 1.     Testimony of Mr. Statham

Mr. Statham testified that Skyline was formed upon the dissolution of Aluminum Storefront, a glass installation business of which they were both employees.  Mr. Statham had been a sales manager, and Mr. Waterhouse a project manager.  Tr. 26:9-20.  He testified that the premise behind the business was that he would take care of "the

administrative end of the business," including "accounting, sales estimating, accounts

payable, accounts receivable, payroll," while Mr. Waterhouse would "see that [the jobs]

were completed" after they were sold.  Tr. 31:1-12.  Mr. Statham testified that they had

an agreement about the allocation of responsibilities along those lines:

> My background had always been in the office, and I was to handle all of the
> administrative functions, financial, hire, fire, in the office.  Doug would
> handle the production end of it, getting the jobs done, and he would handle
> the hiring and firing in the shop, with the union.

Tr. 31:25-32:5.  In this regard, Mr. Statham testified that, if Mr. Waterhouse had paid

creditors without his approval, it would have effectively ended their partnership.  Tr.

67:10-12.

Mr. Statham testified that the question of how much to bill a client would fall to

the project manager and would involve Mr. Waterhouse.  Tr. 37:9-25.  However, he

testified that the ultimate responsibility for the actual billing was with the accounting

department, who reported to Mr. Statham.  Tr. 38:1-9.  Mr. Statham further testified that

Mr. Waterhouse could have been involved in the determinations of which creditors to be

paid, but often was not due to his responsibilities in the field.  Tr. 38:25-39:8.  However,

he testified that, if Mr. Waterhouse needed funds to be paid to a vendor or if there was "a

problem on a job," he would ask Mr. Statham to release those funds.  Tr. 39:9-21.

Additionally, he testified that both he and Mr. Waterhouse would discuss capital

expenditures and, to that extent, both controlled Skyline's financial policy.  Tr. 62:4-12.

Mr. Statham also testified about Skyline's previous issues with the IRS.  He

testified that he was the person to determine whether the IRS should be paid, but stated

that "[t]he only time that [Mr. Waterhouse] was ever consulted would be if – if there was

a problem and I wasn't going to be able to get them taken care of maybe as quickly as I

would like to." Tr. 39:25-40:9. He further stated that the IRS would call or send a letter

informing them of the deficiency, and came to the office "four or five times" over the

course of 15 years. Tr. 44:2-15. He testified that he would not tell Mr. Waterhouse about

the issue if it would be taken care of quickly, but sometimes did tell him about the issue.

Tr. 44:16-45:8. However, he testified that he would always present Mr. Waterhouse with

a plan for payment at the same time. Tr. 45:9-17.

Regarding the IRS deficiencies at issue here, Mr. Statham testified about the

events surrounding his interview with the IRS on September 9, 2003. He could not recall

whether he had informed Mr. Waterhouse of the deficiency prior to the interview, but

admitted after reviewing the interview report that he must have. Tr. 56:1-12. He further

testified that Mr. Waterhouse never followed up with him about the deficiency, but stated

that it was reasonable because previous deficiencies had always been resolved. Tr.

56:13-23. While Mr. Statham could not recall a time when Mr. Waterhouse expressed an

interest in paying the IRS, he did recall that Mr. Waterhouse expressed an interest in

paying employees who worked under him. Tr. 57:8-16. Additionally, Mr. Statham

testified that Mr. Waterhouse was concerned, as he would be "because he knew it was a

payable," but that he may not have "realized that maybe he should have been more

concerned." Tr. 70:2-8. He also testified that Skyline did pay creditors other than the

IRS while the deficiency was owed. Tr. 59:1-9. Finally, he stated that "when the

business was closed, the money was in the receivables, and in the bank, to have taken

care of this obligation." Tr. 70:14-16.  However, he stated, "everything happened so fast," implying that this prevented the deficiency from being resolved.  Tr. 70:18.

Mr. Statham testified that Skyline's financial problems came to a head following a strike in 2002 and an ensuing dispute with the union.  While Skyline and the union had an ongoing dispute regarding pension payments, Mr. Statham testified that the most direct cause of Skyline's bankruptcy was the union's decision to pull its workers and reassign them to other companies based on the incorrect assumption that Skyline was liquidating its assets.  Tr. 59:10-60:12.

### 2.      Testimony of Mr. Waterhouse

Mr. Waterhouse testified that his duties were running "the field and the shop, production," which meant that "[w]e would—our draftsman would draw the job up, we would field measure it, we would fabricate the aluminum, order the glass cut size from a vendor, and then we would—our field guys would go out and install it."  Tr. 81:22-82:5. This involved ordering materials according to the needs of the job.  Tr. 82:8-14. Sometimes this process included Mr. Statham, but sometimes the project manager for the job would order the materials.  Tr. 82:23-83:6.

Mr. Waterhouse testified that he did not have "any kind of financial authority over running the company."  Tr. 84:16-18.  However, he also stated immediately thereafter that he did not have to run material purchases by Mr. Statham.  Tr. 84:19-85:2.  He testified that his time was evenly split between the field and the office.  Tr. 93:21-23.

Regarding the IRS, Mr. Waterhouse testified that he found out about a previous deficiency once, in "early '01," in which the IRS filed a lien against Skyline.  Tr. 90:6-

12.  He stated that it had already been resolved by Mr. Statham by the time he found out about it.  Tr. 90:13-18.

Regarding the deficiencies at issue here, Mr. Waterhouse testified that Mr. Statham had informed him of the company's issues with the IRS by the time that Mr. Statham's IRS interview was conducted in September 2003, stating that "he told me he was expecting them to show up on the doorstep."  Tr. 98:10-19.  Mr. Waterhouse further testified that he did not recall ever asking Mr. Statham about making any payment to the IRS because he thought that Mr. Statham would tell him if it was going to be a problem. Tr. 100:11-23.  Mr. Waterhouse testified that he recalled meeting with the IRS in February 2004, though he thought that the meeting occurred earlier than that.  Tr. 98:20-99:12.  Mr. Waterhouse testified that he could not recall ever following up with Mr. Statham about the tax liability after his interview with the IRS.  Tr. 100:11-23.

Finally, Mr. Waterhouse disputed his earlier testimony that Skyline was underfunded from the beginning, stating instead that many businesses are by nature underfunded and that Skyline may have grown faster than it should.  Tr. 106:17-107:24. He admitted, however, that he had testified at his earlier deposition that Skyline had been underfunded.  Id.

## II.    DISCUSSION

### A.    Burden of Proof

The general rule is that assessments made by the IRS are presumed correct and thus the taxpayer bears the burden of proof.  Brinskele v. United States, 88 Fed. Cl. 334, 339 (2009) (citing Ferguson v. United States, 484 F.3d 1068, 1077 (8th Cir. 2007); Riley

v. United States, 118 F.3d 1220, 1221 (8th Cir. 1997)), aff'd, 397 F. App'x 662 (Fed. Cir.

2010).  Once the Government establishes "a prima facie case by presenting the

assessments made against the plaintiff," the "burden of production and persuasion . . . lies

upon the plaintiff" and must be shown by a preponderance of the evidence.  Farkas v.

United States, 57 Fed. Cl. 134, 140 (2003), aff'd, 95 F. App'x 355 (Fed. Cir. 2004).

Thus, "[w]hen challenging a Section 6672 assessment, '[t]he taxpayer bears the burden of

proving both that he was not a responsible person and that his failure to pay over the

taxes was not willful.'"  Brinskele, 88 Fed. Cl. at 339 (quoting Stuart v. United States,

337 F.3d 31, 36 (1st Cir. 2003), abrogated on other grounds by Jennings v. Jones, 587

F.3d 430, 438 n.10 (1st Cir. 2009)).  The plaintiff bears the burden of proof "both for his

own claim and against the government's counterclaim."  Id.

As noted above, there are two prerequisites for liability under § 6672.  First, the

assessed individual must be a "responsible person," someone who has "both the

responsibility and authority to avoid the default."  Salzillo v. United States, 66 Fed. Cl.

23, 32 (2005).  Second, the individual must have acted "willfully."  Id. at 31; Slodov v.

United States, 436 U.S. 238, 254 (1978).  The court turns to each of these questions in

turn.

### B.     Mr. Waterhouse Was A Responsible Person

Under § 6672, an individual is considered a responsible person "if he retains

sufficient control of corporate finances that he can allocate corporate funds to pay the

corporation's other debts in preference to the corporation's . . . tax obligations."

Brinskele, 88 Fed. Cl. at 346 (citing Jefferson v. United States, 546 F.3d 477, 480 (8th

Cir. 2008)).  "As a general proposition it may be safely postulated that one who is the founder, chief stockholder, president, and member of the board of directors of a corporation . . . is rebuttably presumed to be the person responsible under [§ 6672] . . . ." Id. (quoting Feist v. United States, 607 F.2d 954, 960 (Ct. Cl. 1979); Jefferson, 546 F.3d at 480-81; Godfrey v. United States, 748 F.2d 1568, 1576 (Fed. Cir. 1984)).  Thus, the court focuses its factual inquiry into whether the plaintiff had the "power to compel or prohibit the allocation of corporate funds."  Godfrey, 748 F.2d at 1576.  In this regard, more than one person in a company may be a responsible person.  Jenkins v. United States, 101 Fed. Cl. 122, 132 (2011); Brinskele, 88 Fed. Cl. at 346 (citing Stuart, 337 F.3d at 36).

Plaintiff argues that the facts and testimony establish that Mr. Waterhouse lacked any authority, control, or input over day-to-day financial decisions at Skyline not related to production and thus he was not a responsible person under Section 6672.  According to plaintiff, day-to-day financial decisions, including the disbursement of any and all funds, were the sole responsibility of Mr. Statham.  Plaintiff contends that his role in financial matters of Skyline was merely mechanical, and that he signed checks only when directed to do so.  Further, plaintiff argues, he often worked in the field away from the office, did not control a majority of the company, did not oversee all employees, and did not always take a regular salary.  Overall, plaintiff argues, his status as a responsible person is a close call, but the facts weigh in favor of finding that he is not one.[4]

---

[4] Plaintiff has identified seven factors that he argues, based on Godfrey, should be considered by the court in determining his status as a responsible person: (1) control over payroll, (2)

Plaintiff also argues that the facts and testimony establish that it was reasonable for him to believe and rely on Mr. Statham when he allegedly told Mr. Waterhouse that the tax deficiencies would be handled.  Plaintiff notes that the IRS had visited Skyline during an early period in which Skyline struggled to pay its tax obligations, and contends that the successful resolution of those deficiencies gave Mr. Waterhouse reasonable confidence that Skyline's obligations would be similarly resolved when he discussed the matter with Mr. Statham in 2003.  Plaintiff further argues that this confidence made it reasonable for Mr. Waterhouse to continue to do business after his IRS interview in February 2004 without ever inquiring into the resolution of the taxes owed.

The government argues that the facts and testimony establish that Mr. Waterhouse possessed sufficient authority over Skyline's finances to be a "responsible person." According to the government, plaintiff's decision to defer to Mr. Statham on most financial matters does not exempt him from his responsibilities as an owner of Skyline. The government argues that an individual need not be the ultimate decision-maker or the most responsible person in order to be a § 6672 responsible person.  Instead, the government argues, based on Brinskele and Jenkins,[5] that there may be multiple responsible parties, and both Mr. Statham and Mr. Waterhouse should be considered responsible parties for Skyline.

---

ownership of voting stock, (3) management of business affairs, (4) ability to direct payment to creditors, (5) time spent at the company office, (6) control over hiring and firing of employees, and (7) taking a regular salary.  748 F.2d at 1575-76.

[5] The government also cites Gephardt v. United States, 818 F.2d 469, 476 (6th Cir. 1987), in support of its argument.

The court finds that Mr. Waterhouse was a responsible person within the meaning of § 6672.  As an equal owner of Skyline with Mr. Statham, the evidence established that plaintiff possessed authority over Skyline's finances.  He signed checks for the company, including on one occasion a check to the IRS.  He made financial decisions regarding production and payroll and had the authority to hire and fire the majority of Skyline's employees.  He met with Mr. Statham regularly about the business and had to concur in major financial decisions.  The fact that he did not focus his attention on the company's day-to-day administrative dealings does not negate the fact that he had that authority and the accompanying responsibility to oversee Skyline's financial obligations.  Plaintiff's argument that Mr. Waterhouse only oversaw Skyline's production and field employees and could not be a "responsible person" is not supported by the facts.  His control over Skyline's production provided Mr. Waterhouse with a significant amount of financial responsibility, including control over Skyline's substantive business.  It is undisputed that Mr. Waterhouse was responsible for dealing with vendors and suppliers in order to complete Skyline's jobs.  Those vendors, suppliers, and employees continued to be paid after Mr. Waterhouse became aware that Skyline was deficient in its tax obligations to the United States.  Indeed, the Federal Circuit has held that "where a person has authority to sign the checks of the corporation or to prevent their issuance by denying a necessary signature or where the person controls the disbursement of the payroll or controls the voting stock of the corporation he will generally be held 'responsible.'"  Godfrey, 748 F.2d at 1576 (internal citations omitted).

The fact that Mr. Waterhouse was not the controlling shareholder does not alter the court's analysis.  Both Mr. Waterhouse and Mr. Statham equally held 40% of the stock after Mr. Lee's purchase, and it was clear from Mr. Statham's testimony that he believed he and Mr. Waterhouse shared responsibility for Skyline's success.  As a result, Mr. Waterhouse's position as a minority shareholder is not relevant.  Similarly, plaintiff's contention that his time away from the home office weighs against his status as a responsible person is not persuasive.  It is undisputed that Mr. Waterhouse checked in at the office on a daily basis and thus remained tied in to the overall function of Skyline.  He and Mr. Statham also met regularly to discuss the business and apparently had to agree on capital expenses.

Mr. Waterhouse also argues that he was not responsible because he did not receive a regular paycheck from time to time.  However, plaintiff only did not receive a paycheck in cases where he expressly elected to defer compensation as a loan to Skyline.  As a result, rather than distancing him from Skyline, plaintiff's deferral of compensation makes it more clear that Mr. Waterhouse was involved in Skyline's finances.

The court further finds that Mr. Statham's testimony that he was the responsible person did not establish that Mr. Waterhouse was not also a responsible person.  To the contrary, Mr. Statham explained that Mr. Waterhouse had the authority to open bank accounts, make large purchases, obligate Skyline to contracts, and obtain loans.  Mr. Statham testified that Skyline was a business that constantly needed to keep an eye on its financial state, which included determining which clients had paid Skyline and which creditors were currently owed.  Tr. 57:21-58:25.  In such circumstances, Mr. Waterhouse

had to know that he was making financial choices when he signed checks on behalf of

Skyline.  In this connection, the court finds plaintiff's argument based on Mr. Statham's

testimony that the partnership would have been dissolved had Mr. Waterhouse exercised

any independent authority over Skyline's finances to be unavailing.  There is no

document reflecting any such agreement or any other evidence in the record to suggest

that the division of labor between Skyline's principals was legally binding.  Tr. 63:21-24.

Accordingly, while it may have been important for the practical functioning of Skyline

for Mr. Waterhouse and Mr. Statham to divide responsibilities, it did not legally limit Mr.

Waterhouse from ensuring that the IRS was paid.  Had he wished to exercise it, Mr.

Waterhouse retained the same legal authority over Skyline's finances as Mr. Statham.  It

is well-established that "[t]here may be more than one responsible person."  Stuart, 337

F.3d at 36 (citing Harrington v. United States, 504 F.2d 1306, 1312 (1st Cir. 1974)).

Thus, while the court accepts that Mr. Statham may have been the primary party

responsible for administering Skyline's finances, it is clear that Mr. Waterhouse was also

a responsible person within the meaning of § 6672.

## C.    Mr. Waterhouse Acted Willfully

In addition to being a responsible person, a person must have acted "willfully" in

order to be liable under § 6672.  As described by the Federal Circuit, willfulness means

"a deliberate choice voluntarily, consciously, and intentionally made to pay other

creditors instead of paying the Government . . . [and it] may also include a reckless

disregard of an obvious and known risk that taxes might not be remitted."  Godfrey, 748

F.2d at 1577 (internal citations and quotation marks omitted).  A finding of willfulness

requires more than mere negligence, however.  Id.; see also Gustin v. United States, 876

F.2d 485 (5th Cir. 1989); Bauer v. United States, 211 Ct. Cl. 276, 289 (1976); Dudley v.

United States, 428 F.2d 1196 (9th Cir. 1970).  Nevertheless, a responsible person cannot

avoid reckless behavior through insulation and may not "immunize himself from the

consequences of his actions by wearing blinders which will shut out all knowledge of the

liability for and the nonpayment of its withholding taxes." Bolding v. United States, 565

F.2d 663, 674 (Ct. Cl. 1977).[6]  This court has further held that willfulness is shown where

a responsible person fails to take action, Jenkins, 101 Fed. Cl. at 135, or where other

creditors are paid after the deficiency is known, Kobus v. United States, 103 Fed. Cl. 575,

586 (2012).

Plaintiff argues that he could not have acted willfully for two main reasons.  First,

plaintiff argues that mere negligence is insufficient to satisfy the willfulness standard.

Instead, plaintiff argues, he must have acted with a reckless disregard to an obvious risk

that the trust fund taxes would not be paid in order to be willful.  Plaintiff contends that

Skyline's past history of payment to the IRS and strong business reputation gave him

reason to believe that Mr. Statham would pay Skyline's taxes without his intervention.

According to plaintiff, Mr. Statham's testimony establishes that Skyline could have paid

the IRS but failed to do because "everything happened so fast," not because of Mr.

Waterhouse's actions or lack thereof.  Tr. 70:18.

---

[6] Indeed, some courts have held that a responsible person has a duty to use all unencumbered funds to pay deficient taxes, once known.  United States v. Kim, 111 F.3d 1351, 1357 (7th Cir. 1997).

In the alternative, plaintiff argues that this court should adopt the reasonable cause standard used in the Fifth, Sixth, and Tenth Circuits.[7]  Plaintiff states that those circuits have proposed a narrow exception to § 6672 in which a plaintiff who can demonstrate that there was reasonable cause for the non-payment of taxes is not liable to the government.  Plaintiff argues that such a standard protects government revenue while discouraging companies from effectively self-executing loans using trust funds and avoiding circumstances where the government is an unwilling partner in a struggling business.

In response, the government argues that plaintiff acted willfully by failing to take any action to ensure that Skyline's trust fund taxes were paid.  The government argues that there is no dispute that plaintiff knew about these tax deficiencies in 2003 and that plaintiff knew that the taxes were still not paid when he was visited by the IRS in 2004.  Moreover, the government argues, plaintiff continued to pay vendors and authorize payroll checks after learning that taxes were deficient, thereby electing to pay employees and vendors over the government, as well as accruing additional trust fund tax obligations.  Regarding the reasonable cause standard, the government argues that plaintiff has misrepresented the requirements of the standard.  The government contends that the standard as articulated in the Tenth Circuit Finley case cited by plaintiff is not applicable here because it requires a showing that a plaintiff has made reasonable efforts

---

[7] Plaintiff specifically refers to Finley v. United States, 123 F.3d 1342, 1348 (10th Cir. 1997) (en banc), Collins v. United States, 848 F.2d 740, 741-42 (6th Cir. 1988), and Newsome v. United States, 431 F.2d 742, 747 (5th Cir. 1970).

to protect the funds owed to the IRS,[8] which is lacking here due to plaintiff's failure to make any efforts to pay the taxes.  The government cites cases from the Eighth, First, and Seventh Circuits to argue that the reasonable cause standard cannot apply where a person is responsible and the taxpayer takes no action to ensure that the taxes are paid.[9] According to the government, plaintiff's failure to take any affirmative action related to Skyline's tax obligations after knowing that the taxes were owed was in contravention of his corporate duties and responsibilities, thereby showing decisively that his conduct was willful.

The court finds that the evidence and testimony establish that plaintiff acted willfully.  First, the evidence establishes that Mr. Waterhouse was aware of the tax deficiency.  In the report of Mr. Statham's interview with the IRS on September 3, 2003, Mr. Statham stated that he had informed both Mr. Waterhouse and Mr. Lee of the tax

---

[8] In Finley, the Tenth Circuit did not offer guidance about what constitutes "reasonable efforts to protect."  123 F.3d at 1348.  However, the court's indication that it acted "narrowly" and the test set forth—"(1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control"—indicate that some affirmative action is required, either by directing the payment of the deficient taxes or preventing payments to other creditors.  Id.  The court was concerned with whether willfulness was a question of fact or law, and sought to avoid a standard that essentially constituted strict liability.  Id. at 1346 ("we are troubled by the possibility the courts have transformed 26 U.S.C. § 6672 into a strict liability statute, outside the jury's realm").  In that case, the plaintiff had directed the payment of the taxes and, when he learned that they were still owed, attempted and failed to obtain a loan to pay the deficient taxes.  Id. at 1343-44.  He then deposited "collections" in the company's bank account and directed the bank to apply it to the tax balance, but the bank refused and used the money to pay down a loan debt owed to the bank.  Id. at 1344.

[9] The government specifically refers to Olsen v. United States, 952 F.2d 236, 241 (8th Cir. 1991) (citing United States v. Strebler, 313 F.2d 402, 403 n.2 (8th Cir. 1963)); Harrington v. United States, 504 F.2d 1306, 1315-16 (1st Cir. 1974), and Monday v. United States, 421 F.2d 1210, 1216 (7th Cir. 1970).

issue prior to the interview, though he could not recall the specific dates on which he had informed them.  Def.'s Tr. Ex. 5 at 006.  Second, Plaintiff has made no showing that he had any interest in Skyline paying its deficient trust fund taxes, or was concerned that the taxes were owed while Skyline continued to pay other creditors.  Instead, it is clear that Mr. Waterhouse, after learning of the tax deficiency from Mr. Statham in 2003 and again from the IRS agent in 2004, disregarded the fact that taxes were owed and accumulating and instead continued to operate the business by seeking payments for vendors and employees.  As Mr. Statham testified, he could not recall a time when Mr. Waterhouse expressed any interest in paying the IRS, but could recall an instance after Mr. Waterhouse became aware of Skyline's tax obligation when Mr. Waterhouse was concerned about the payment of employees.  Continuing to pay other creditors, including employees, once the tax deficiency is known is sufficient to constitute willfulness. Kobus, 103 Fed. Cl. at 586; see also Kim, 111 F.3d at 1357 (responsible person has a duty to use all unencumbered funds to pay back taxes).

Plaintiff's argument that Mr. Waterhouse did not act willfully because he reasonably relied on Skyline's past history of making payments of delinquent taxes is unavailing.  The fact that Mr. Statham paid Skyline's taxes without discussion with Mr. Waterhouse before 2003 does not make Mr. Waterhouse's conduct in and after 2003 reasonable.  Mr. Waterhouse had a responsibility to ensure that Skyline's taxes were paid after Mr. Waterhouse learned of the tax deficiency in 2003 and the continuing problem in 2004.  Mr. Waterhouse's decision to ignore Skyline's tax liability after he was told of the problem in 2003 and was visited by the IRS in 2004 was plainly reckless.

The court further agrees with the government that this case is not an appropriate case for the application of the reasonable cause standard as the plaintiff failed to prove any of the elements of the standard, even if this court were to adopt it.  Under that standard, as described by the Tenth Circuit, "reasonable cause sufficient to excuse a responsible person's failure to pay withholding taxes should be limited to those circumstances where (1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control."  Finley, 123 F.3d at 1348.  This creates, as described by the Tenth Circuit, a narrow and fact-based exception to avoid imposing strict liability on plaintiffs who made an effort to pay the taxes but were prevented from doing so by circumstances beyond their control.  Id. at 1346.  In this case, plaintiff failed to provide any evidence to support an argument that he made any efforts—reasonable or otherwise—to protect monies owed to the United States.  To the contrary, the evidence shows that Mr. Waterhouse directed payments to be made to other parties despite the deficient taxes and neither directed payments to be made to the United States nor sought assurances that such payments had been made    .  In such circumstances, there is nothing to excuse plaintiff's willfulness.

## III.   CONCLUSION

For the reasons set forth above, the court finds that plaintiff has failed to meet his burden of showing that the IRS's assessment of trust fund assessments and penalties under § 6672 are incorrect.  Accordingly, the court finds that Mr. Waterhouse is liable to the government for the assessments and penalties.  The parties shall file a proposed judgment reflecting plaintiff's liability by July 30, 2015.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge